# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 03-2628

HERBERT L. BOARD, *et al.*,

*Plaintiffs-Appellees,*

*v.*

KARL FARNHAM, JR., *et al.*,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 01-2190—**Michael P. McCuskey**, *Chief Judge.*

ARGUED DECEMBER 12, 2003—DECIDED JANUARY 5, 2005

Before COFFEY, RIPPLE, and KANNE, *Circuit Judges.*

COFFEY, *Circuit Judge.* Brothers Herbert and Jerome Board (collectively the "Boards"), along with three other plaintiffs, filed a sixteen-count complaint against fourteen defendants in their individual and official capacities alleging various constitutional injuries pursuant to 42 U.S.C. § 1983, as well as state law violations dealing with the Board brothers' arrest, incarceration, and subsequent acquittal on murder charges in Edgar County, Illinois. As a result of a voluntary dismissal and the district court's unchallenged grant of summary judgment in favor of the defendants on a

number of their claims, only three of the Boards' constitutional claims survive. On interlocutory appeal, defendants-appellants claim the district court erred by not granting them summary judgment on the remaining claims because they are entitled to qualified immunity. Affirmed.

## I.  BACKGROUND

In September of 1984, two Indiana men failed to return home at the end of the day. Neither the men nor their bodies were ever found, and the two men were eventually declared legally dead. On August 2, 2000, brothers Herbert "Duke" Board ("Duke") and Jerome Board ("Jerry"), residents of nearby Paris, Illinois, were arrested and charged with the murders of the two men.

While awaiting trial, Duke and Jerry were held at the Edgar County Illinois Jail ("Jail") for 126 days. On December 6, 2000, they were released from custody following their acquittal on the murder charges. During the brothers' detention at the Jail, defendant Karl Farnham, Jr. was the Sheriff of Edgar County and defendants Allen Verchota and Kent Rhoades were jailers. At maximum capacity, the two-story Jail could house up to 28 inmates and was staffed by one jailer per shift, per floor. Both men claim that the alleged inhumane and inadequate conditions which existed at the Jail during their confinement infringed upon their constitutional rights.

### A.  The Jail's Toothpaste Provision

When the Boards were admitted to the Edgar County Jail, it was the Jail's policy to provide inmates, upon induction, with basic toiletry items—such as soap, toothpaste, and shampoo—free of charge. In addition, inmates also had the option of purchasing brand-name items from the Jail commissary. In the event that the inmate's supply of a

given toiletry item ran low, inmates could either request additional items, free of charge, from the Jail's staff or purchase the brand-name items from the commissary. However, inmates in custody were not allowed to receive such items from outside sources (*e.g.*, friends, family and other visitors) for security reasons.

Pursuant to the Jail's policy, Duke and Jerry each received a Jail-issued toothbrush and a supply of toothpaste, deodorant, one blanket, and an orange jumpsuit when they were booked into the Jail on August 2, 2000. In spite of this, however, Jerry claims he did not have toothpaste for 90% of the time during his stay in Jail. Similarly, Duke claims he went without toothpaste for three-and-a-half weeks, although he requested that Farnham supply him with additional toothpaste on approximately 15 different occasions during that time. Duke claims that this deprivation caused him to suffer tooth decay resulting in the removal of several of his teeth while he was confined in the Jail.

## B. The Jail's Ventilation System

While incarcerated, Duke and Jerry also suffered frequent nosebleeds which they attributed to the Jail's poor ventilation system. Duke and Jerry claim the Jail's heating and air flow system issued a "constant flow of black fiberglass dust into the cells which caused Jerry, Duke and other inmates to have countless nosebleeds." Appellee's Br. at 20. Indeed, Duke testified that he suffered from nosebleeds "[e]very day" he was confined in the Jail, starting about two weeks after his confinement began. Duke Board Dep. at 130. News of this prompted the Boards' father, Herbert Board, to contact Jacob Payne, an Edgar County Board member, to discuss the Jail's ventilation system. As a result of this conversation Farnham hired a heating contractor, Richard Walker ("Walker"), to investigate the concerns and address any issues that may exist. Farnham allegedly told him that

"some inmates were sick and the ducts were suspected [as the cause]." Walker Aff. ¶ 4. According to Farnham, Walker's investigation found nothing wrong with the ventilation system. Nonetheless, Farnham instructed a maintenance crew to clean the vent covers, and suggested that the Jail administrators change the air filters every thirty days.

Walker testified via sworn affidavit that he observed the following upon inspection of the duct work: (a) "a thick layer of dust and dirt inside the duct work"; (b) "the ducts were lined with an approximate [sic] one inch thick black fiberglass duct liner; this old-fashioned duct liner does not have the protective coating that newer duct liner has [sic], to prevent the fiberglass particles from entering the air flow"; (c) "the liner did not look deteriorated[,] but when I touched it, a large cloud of black dust rolled off the liner; and (d) "I saw actual particles of fiberglass throughout the black dust." Walker Aff. ¶ 6. In response to these observations Walker stated that he told Farnham that the Jail may be suffering from "sick building syndrome," as a result of the fiberglass and bacteria present in the ventilation system. Walker Aff. ¶ 9. In addition, Walker claims he told Farnham that if people were becoming ill, the duct work system should be replaced because, among other things, "[a]ny airborne bacteria or diseases [could] be communicated through the common ductwork to other parts of the building." *Id*. Farnham allegedly told Walker that he wanted a "quick solution," however, Walker told Farnham that, at the very least, the Jail would have to "clean the entire ductwork system, not simply where the air comes out." *Id*. Also, Walker gave Farnham an estimate for the installation of a superior filter and black-light system to kill bacteria in the ducts, but never heard back from Farnham. *Id*. at ¶ 11. Walker went on to state that, in his experience, fiberglass particles in the air circulation system can cause nosebleeds and respiratory problems, including those described by Duke and Jerry.

Apparently Farnham chose not to take Walker's recommendation seriously. Duke Board testified that he was unaware that any inspection had taken place. Duke Dep. at 133. In addition, Duke stated that Farnham told him that the maintenance crew at the Jail would vacuum the vent covers and registers, but that the ducts (the source of the black fiberglass particles) could not be cleaned without tearing apart the ceilings. *Id*. at 132. A fellow inmate at the Jail stated in his affidavit that, during the time period when the Boards were being held at the Jail, the Jail's staff only attempted to vacuum the vents one time. *See* Weiland Aff. ¶ 4. Wieland also stated that "the jail was dusty and dirty all the time [and] even when we swept [the black fiberglass residue] up it was dirty just hours later with black dust all over." *Id*. at ¶ 5.

## C. *Duke's Asthma*

In addition to causing nosebleeds, Duke Board claims the poor ventilation system exacerbated his pre-existing asthma; a condition which he had previously been able to control with prescription asthma medication. While incarcerated, Duke was granted access to his inhaler, as well as nebulizer treatments to aid his troubled breathing. However, on at least two occasions, when Duke's asthma did not respond to such treatments, Jail personnel took him to the emergency room of a nearby hospital for additional treatment. Duke also claims that jailers Verchota and Rhoades denied his requests for his inhaler on several occasions, thus contributing to and exacerbating his asthmatic problems.

According to his mother, before being jailed Duke had his asthma condition under control and "was not using much medication or having asthma attacks." Young Aff. ¶ 7. However, while in Jail, Duke's condition took a turn for the worse (a circumstance which he blames, at least in part, on the poor ventilation system at the Jail). While incarcerated,

Duke was provided with an "albuterol" inhaler,[1] which he states was prescribed to prevent the obstruction of his airway associated with asthmatic complications. See Duke Dep. at 163-65. Duke testified that he was allowed to keep his inhaler in his cell for approximately five to ten days, but thereafter he was required to request the device from jailors. *Id.* at 164-65. However, Duke claims Verchota and Rhoades did not always comply with his requests. Duke stated that there were times when Verchota and Rhoades would "not give [him] medication when [he] asked for it," despite his pounding and kicking the walls to alert the guards that he was having an attack. *Id.* at 166. Duke claimed he would go all night without his medication and in the morning would "be almost frickin' de[a]d." *Id.*

## D.  The Plaintiffs' Complaint

After their acquittal and subsequent release from Jail in December of 2000, Duke and Jerry returned to Paris, Illinois. Subsequently, a group of five plaintiffs filed suit in response to the circumstances surrounding Duke and Jerry's arrest, criminal investigation, and incarceration. Their lengthy complaint, filed pursuant to 42 U.S.C. § 1983, included 208 paragraphs, eighteen individual counts, and fourteen named defendants. As a result of voluntary dismissal and the district court's unchallenged grant of the defendants' motion for summary judgment on a number of

---

[1]  Albuterol is the scientific name for the drug used in a number of brand-name asthma inhalers such as Ventolin HFA. See Dunplay, et al. Physician's Desk Reference 1665-67 (58th ed. 2004). Albuterol is a beta2-adrenergic bronchodilator, which means it "relaxes the smooth muscles of all airways, from the trachea to the terminal bronchioles." *Id.* at 1666. Inhalers containing albuterol are used to control the symptoms brought on by a asthma attacks. *See id.*

the claims, only Duke and Jerry remain as plaintiffs and only three of their constitutional claims survive. The denial of summary judgment concerning these three claims form the basis for this interlocutory appeal.

The following constitutional claims remain: whether (1) Farnham infringed on the Boards' constitutional rights by failing to provide them with toothpaste; (2) Farnham failed to provide humane conditions of confinement for Duke and Jerry by failing to remedy the Jail's ventilation system which caused serious medical problems in the form of nose-bleeds, respiratory distress and asthma attacks; and (3) Verchota and Rhoades were deliberately indifferent to a serious medical condition when, on a number of occasions, they failed to provide Duke with his inhaler upon his request.

Each of these claims alleges a violation of the Eighth Amendment's prohibition on cruel and unusual punishment as applied to pre-trial detainees by way of Due Process Clause of the Fourteenth Amendment. In the district court's 40-page Order, Judge Michael P. McCuskey, presiding, held that these claims should survive summary judgment because they presented a genuine issue for trial, notwithstanding the defendants-appellant's qualified immunity defense.

On June 16, 2003, Farnham, Verchota, and Rhoades filed a timely notice of interlocutory appeal. As in the district court, the defendants-appellants claimed that, because they are government employees, and because the specific constitutional rights asserted by the Boards' were not clearly established during the time of their incarceration, they are entitled to qualified immunity, and as such, summary judgment should have been granted. We Affirm.

## II. ANALYSIS

Under 28 U.S.C. § 1291, we have jurisdiction to hear appeals only from "final decisions" of district courts. *Coady v.*

*Steil*, 187 F.3d 727, 730 (7th Cir. 1999); *see Whitt v. Smith*, 832 F.2d 451, 453 (7th Cir. 1987). Interlocutory appeals are an exception to this rule. *Coady*, 187 F.3d at 730. A district court's denial of a claim of qualified immunity, notwithstanding the absence of a final judgment, is immediately appealable as a final decision to the extent that it turns on an issue of law. *Whitt*, 832 F.2d at453.

However,"'a defendant entitled to invoke a qualified-immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record set forth a 'genuine' issue of material fact.'" *Coady*, 187 F.3d at 730 (quoting *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995)). Thus, while it is inappropriate for us to review a district court's determination about the sufficiency of the evidence warranting summary judgment or whether a genuine issue of material fact is in dispute on interlocutory appeal, we may review "abstract issues of law." *See Johnson*, 515 U.S. at 317. We have held that our jurisdiction extends to interlocutory appeals such as this one challenging a district court's determination that a set of facts demonstrate a violation of "clearly established" constitutional law and preclude the defendants from proffering a qualified immunity defense. *Id.*; *see Coady*, 187 F.3d at 730-31.

When deciding whether a public official is entitled to qualified immunity, "'we simply assume the disputed facts in the light most favorable [to the plaintiff], and then decide, under those facts, whether the [defendants] violated any of [the plaintiff's] clearly established constitutional rights." *Id.* (quoting *Brewster v. Board of Educ. of Lynwood Unified School Dist.*, 149 F.3d 971, 977 (9th Cir. 1998)). To that end, this appeal may properly consider the defendants Farnham, Verchota, and Rhoades' arguments that the district court erred in denying them summary judgment on the Boards' claims that deprivation of toothpaste, deprivation of Duke's inhaler, and inadequate ventilation violated their established constitutional rights. *See id.*

As referred to above, qualified immunity shields government employees from liability for civil damages arising from actions within the scope of their employment unless their conduct violated "clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *accord Thomas v. Ramos*, 130 F.3d 754, 763 (7th Cir. 1997). Qualified immunity is an "*immunity from suit* rather than a mere defense to liability," *see Mitchell v. Forsyth*, 472 U.S. 511, 526-27 (1985). Thus, in the interest of judicial economy, this court reviews qualified immunity questions on interlocutory appeal rather than forcing the parties to endure trial, which would be rendered futile if the defendants were found to have been immune from suit on direct appeal.

We review a trial court's denial of a defendant's claim of qualified immunity *de novo, see Finsel v. Cruppenink*, 326 F.3d 903, 906 (7th Cir. 2003), and undertake a two-part analysis, asking: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional right"; and (2) whether the right was clearly established at the time of its alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Stated differently, even if we conclude that the defendant's alleged actions were improper to the point of being unconstitutional, the defendant is still entitled to qualified immunity unless the unconstitutionality of the actions was clearly established at the time of their occurrence. *Id*.

In determining whether a constitutional right has been clearly established, it is not necessary for the particular violation in question to have been previously held unlawful. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Mitchell*, 472 U.S. at 535 n.12 (holding that a clearly established right does not require judicial precedent to that effect). Instead, a clearly established constitutional right exists in the absence of precedent, where "the contours of

the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. To that extent, government officials are considered "on notice" that conduct is violative of established law if the state of the law at the time gave them "fair warning" that their conduct would be unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see Finsel*, 326 F.3d at 908.

At the outset, we note that the constitutional rights of a pretrial detainee are derived from the Due Process Clause of the Fourteenth Amendment and are distinguishable from an inmate's right not to be subjected to cruel and unusual punishment under the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). Pursuant to constitutional requirements, a pretrial detainee "may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell*, 441 U.S. at 535. Therefore, when assessing the constitutionality of the conditions or restrictions of pretrial detention, we must determine whether the conditions allegedly encountered by the detainee amounted to punishment. *Id.* at 536-37; *accord Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir. 1996). However, as this court has made clear on a number of occasions, the mere fact that pretrial detention interferes with a person's desire to live comfortably and free from restraint does not, without more, make the conditions of that confinement unconstitutional. *See*, *e.g.*, *Rapier v. Harris*, 172 F.3d 999, 1003 (7th Cir. 1999); *Tesch v. County of Green Lake*, 157 F.3d 465, 476 (7th Cir. 1998). Rather, conditions of confinement which are "reasonably related to a legitimate and non-punitive government goal," are not unconstitutional, *Antonelli*, 81 F.3d at 1427-28 (citing *Bell*, 441 U.S. at 539), and we caution that this court will give a high degree of deference to the discretion of prison administration to "adopt polices and practices to maintain the safety and security of this country's penitentiaries." *United States v. Tokash*, 282 F.3d 962, 970 (7th Cir. 2001); *see Bell*, 441 U.S. at 548.

Although the Eighth Amendment does not apply to pre-trial detainees, pretrial detainees are entitled to *at least* as much protection as the constitution provides convicted prisoners. *See Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003). The Eighth Amendment protects an inmate from a governmental actor's "deliberate indifference to his basic needs." *Id.* at 620. Under this standard, conduct is "deliberately indifferent" when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998) (quoting *West v. Waymire*, 114 F.3d 646, 651 (7th Cir. 1997)). In *Armstrong*, we noted that "[u]nder other constitutional provisions [such as the Fourteenth Amendment] . . . the standard for deliberate indifference appears closer to tort recklessness." *Id.* In recognition of this, we have articulated the test for deliberate indifference for Fourteenth Amendment purposes to be "a conscious disregard of known or obvious dangers." *Armstrong*, 152 F.3d at 577 (quoting *West*, 114 F.3d at 651). However, considering "the difficulty of peering into minds [of government officials or institutions]," this distinction is of little significance in practical application. *West*, 114 F.3d at 651. Thus, we have found it convenient and entirely appropriate to apply the same standard to claims arising under the Fourteenth Amendment (detainees) and Eighth Amendment (convicted prisoners) "without differentiation." *Henderson v. Sheahan*, 196 F.3d 839, 845 n.2 (7th Cir. 1999); *See Higgins v. Correctional Med. Servs. of Illinois, Inc.*, 178 F.3d 508, 511 (7th Cir. 1999); *see also Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997). In either case the plaintiff has the burden of showing that: (1) the harm to the plaintiff was objectively serious; and (2) the official was deliberately indifferent to her health or safety. *Cavalieri*, 321 F.3d at 620; *see also Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994).

Farnham, Verchota, and Rhoades argue that the district court committed a reversible error in denying them qualified immunity. They argue that even when the facts are construed in the Boards' favor, none of their complaints allege a violation of a constitutional right, and even if such rights did exist, they were not clearly established at the time the Boards were incarcerated. *Cavalieri*, 321 F.3d at 620. Accordingly, our first task is to determine whether the Boards had a constitutional right to: (a) an adequate supply of toothpaste; (b) an asthma inhaler where the detainee is suffering from an established asthmatic condition; and (c) an adequate ventilation system in the Jail. Then, if we find that the district court correctly determined that a constitutional right has been violated, we must then determine whether that right was clearly established at the time of the Boards' confinement. *Id.*

### A.  Constitutional Right to Toothpaste

Appellants first challenge the district court's denial of qualified immunity to Farnham on two counts involving the denial of oral hygiene supplies. Duke alleges his constitutional rights were violated when he was denied toothpaste for three to three-and-a-half weeks, despite repeated requests for the same, which caused him pain and suffering and resulted in the extraction of a number of his teeth. Also, both Duke and Jerry allege a failure to provide humane treatment arising solely from Farnham's depriving them of toothpaste. The Boards' deprivation of toothpaste claims only involve Farnham, because he was the only defendant with the responsibility of providing toothpaste and other necessary hygiene products to inmates and detainees.[2] The

---

[2]  Farnham argues that Duke's testimony attributed toothaches to the two doughnuts he ate every morning for breakfast, and not

(continued...)

district court ruled on both counts, denying summary judgment and holding that the failure to provide toothpaste may constitute deliberate indifference "given Plaintiffs' description of medical problems, including dental troubles." *Board v. Farnham*, No. 01-2190, Slip op. at 28 (C.D. Ill. 2001). However, the deprivation of toothpaste over an extended period of time (allegedly 3.5 weeks for Duke and 16 weeks for Jerry) leading to serious health problems and the denial of toothpaste as a hygiene product without attenuated medical and dental consequences involve slightly different constitutional analyses.

The Eighth Amendment protects a detainee not only from deliberate indifference to his or her *current* serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to *future* health. *Henderson*, 196 F.3d at 846-47 (citing *Helling v. McKinney*, 509 U.S. 25, 33-35 (1993). Thus, Duke's assertion that the deprivation of toothpaste resulted in dental problems can either be analyzed under the deliberate indifference to current or existing medical needs test or under the deliberate indifference to conditions which pose a risk to future health. *See id.* However, Duke and Jerry's claim that toothpaste was denied to them as a hygiene product (without attenuated and contemporaneous medical consequences) may proceed only as a claim of deliberate indifference to a serious medical condition that might in turn thereafter threaten future health or cause serious medical problems threatening *future* health. *See Helling*, 509 U.S. at 34-35. The Boards also claim that the constitutional right to oral hy-

---

[2] (...continued)
to the failure to receive toothpaste. The Boards point out, however, that it is more reasonable to attribute the toothaches to eating two doughnuts a day without being able to brush with toothpaste. We further note that the Jail provided the doughnuts on a daily basis as the sole breakfast food.

giene supplies was clearly established at the time of the alleged violations, which would preclude a holding that the defendants are entitled to qualified immunity. *See Saucier*, 533 U.S. at 201. We discuss each in turn.

### 1. Duke's Denial of Medical Treatment Claim

Appellants argue that the district court erred in finding that Duke and Jerry had a constitutional right to toothpaste as pre-trial detainees under the Eighth Amendment. They argue that without evidence of a "significant injury" (Appellant Br. at 15), there can be no constitutional right to a supply of toothpaste, and thus they should be entitled to qualified immunity on this claim. Appellants are correct to the extent that they assert that the *denial of medical treatment* satisfies the deliberate indifference standard only if significant harm or injury is shown. *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 765 (7th Cir. 2002). However, Duke does allege that he was injured as a result of being deprived access to an adequate supply of toothpaste. Thus, Duke's allegation that his constitutional rights were violated by the Jail authorities' denial of toothpaste *resulting in teeth having to be pulled* is analyzed under the rubric of an inmate's right to receive adequate medical treatment. *See Boyce v. Moore*, 314 F.3d 884, 890 (7th Cir. 2002). Again, to make out a claim under the Eighth Amendment for failure to provide adequate medical treatment, a pre-trial detainee must demonstrate that: (1) his condition was "objectively serious"; and that (2) the defendants were deliberately indifferent to that condition. *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001).

At the outset, we reiterate our view that "dental care is one of the most important medical needs of inmates." *See Wynn*, 251 F.3d at 593 (quoting *Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir. 1980)). In addition, a number of other courts have also held that dental pain accompanied by various degrees of attenuated medical harm may constitute an

objectively serious medical need. *See Fields v. Gander*, 734 F.2d 1313, 1314-15 (8th Cir. 1984); *see also Penrod v. Zavaras*, 94 F.3d 1399, 1406 (10th Cir. 1996) (recession or bleeding of the gums); *Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) (deterioration of teeth due to lack of treatment); *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (an interference with the ability to eat). For example, in *Penrod v. Zavaras*, the United States Court of Appeals for the Tenth Circuit held that, for summary judgment purposes, the deprivation of toothpaste resulting in bleeding gums and tooth decay which had to be attended to by a dentist could constitute serious harm under the Eighth Amendment. *Penrod*, 94 F.3d at 1406.

Duke testified that he suffered from dental pain throughout his incarceration. In addition, he claimed that teeth which should have been surgically removed (and were represented to Duke as having been removed) were merely broken off below the gumline by Dr. Sunkel, a dentist on contract to Edgar County for the purpose of rendering medical treatment to prisoners,[3] posing further risk of serious, even life-threatening infection and possibly death.[4] Address-

---

[3] Referring to the quality of treatment he received when his damaged and decaying teeth were finally treated while in Jail, Duke testified as follows: "When I got out of jail I found that he didn't extract my teeth. He broke them off below the gum and left them. What the hell, I was looking at the death penalty, so he didn't think I was ever going to come back on him, so he broke the sons-of-bitches off and kept me on pain killers the rest of the time I was in jail. I call that physical abuse. You know, can you imagine me sitting in a dentist's chair shackled to it?" (Duke Dep. at 99-100).

[4] The risks posed by tooth loss, the most common cause of which is periodontal disease (of which the most common form is known as gingivitis), cannot be underestimated. Such diseases of the mouth are believed to sometimes contribute to coronary atherosclerosis and a myriad of heart problems, as well as bacterial

(continued...)

ing these facts in the light most favorable to the nonmoving party, there is sufficient evidence to conclude that the plaintiffs have alleged an objectively serious harm with regard to this count. *Fields*, 734 F.2d at 1314-15.[5]

Having determined that an objectively serious harm (dental problems) has been alleged, we next analyze whether the defendants-appellants remained deliberately indifferent to that harm. *Wynn*, 251 F.3d at 593. As noted above, our analysis applies only to Farnham on this count. Duke testified that he was denied adequate supplies of toothpaste for a cohesive period of three to three-and-a-half weeks of

_____

[4] (...continued)
infections such as transient bacteremia or sepsis, all of which are capable of causing death. See Eugene Buaunwald, et al., HARRISON'S PRINCIPLES OF INTERNAL MEDICINE 194-95, 799-800 (15th ed. 2001).

[5] Although, viewing the evidence in the record in the light most favorable to Duke, we find that he has made a sufficient showing of objective medical need to resist a grant summary judgment based on qualified immunity against Farnham, we posit no conclusion as to the ultimate success or failure of his claim. Indeed, the jury may find that Duke's dental condition was due entirely to a pre-existing condition and not due to the lack of toothpaste or adequate medical treatment at the Jail. Duke testified via deposition that he could not remember the last time that he had visited the dentist for a cleaning, although he stated that he went for what he considered "regular" cleanings. Duke Dep. at 161. In addition, Duke testified that, prior to trial, he was told by a dentist that some of his teeth would have to be "surgically removed," because the roots of his teeth were "bound at the top." *Id.* at 160. However, even if the deprivation of toothpaste at the jail merely sped up or caused Duke's dental problems to become more serious, his claim would still survive summary judgment. *See Wynn*, 251 F.3d at 593; *see also Chance v. Armstrong*, 143 F.3d 698, 702-03 (2d Cir. 1998).

his eighteen-week confinement in the Jail.[6] In addition, Duke alleges he was forced to complain to Farnham approximately fifteen times in an effort to secure additional supplies and was allegedly refused on each occasion. A reasonable trier of fact might very well conclude that Farnham was both on notice of Duke's lack of toothpaste, and was or should have been aware of the damage that such a deprivation was causing (or at least contributing to) Duke's dental condition, and that Farnham was deliberately indifferent under the circumstances. Therefore, because "[a]t the summary judgment stage, [Farnham] cannot prevail if [the Boards] can present a version of the facts that is supported by the evidence and under which [Farnham] would not be entitled to qualified immunity," *Hall v. Ryan*, 957 F.2d 402, 404 (7th Cir. 1992), we hold the district court did not commit error in finding that Duke had alleged sufficient evidence of Farnham's deliberate indifference to his constitutional rights. *See id.* at 406.

However, the constitutional right asserted, *i.e.*, Duke's right to have his medical needs attended to as discussed *supra*, must also have been clearly established at the time

---

[6] Duke's deposition, in relevant part, reads:

> Q. Did you complain to anyone from the Edgar County sheriff department about not having adequate amounts of shampoo, soap, or toothpaste?
>
> A. Yes, I did.
>
> Q. Who did you complain to?
>
> A. To the sheriff, Karl Farnham.
>
> Q. And when did you complain to him?
>
> A. I don't remember the date.
>
> Q. Do you remember how many times you complained to him?
>
> A. To the best of my recollection probably 15 times.
>
> Q. And do you remember what his response to you was?
>
> A. We'll get it as soon as we can get it.

the violation occurred. *Cavalieri,* 321 F.3d at 620. The law is clear that deliberate indifference to a serious medical condition is a violation of a clearly established constitutional right. *See, e.g., Walker v. Benjamin,* 293 F.3d 1030, 1040 (7th Cir. 2002). In addition, because a reasonable officer in Farnham's position should or would have understood he was violating Duke's constitutional rights to adequate medical treatment by denying him dental hygiene products which had and were, in all probability, severely impacting Duke's health, *i.e.*, requiring him to undergo dental surgery, we hold Duke had an established constitutional right to toothpaste under the circumstances. *See Saucier*, 533 U.S. at 202. Viewing the facts in the light most favorable to Duke, Farnham's conduct violated Duke's established constitutional right to receive adequate attention for a serious medical condition, and, therefore, Farnham is not entitled to qualified immunity on this claim. *See id.*; *Walker*, 293 F.3d at 1040.

### 2.  Duke and Jerry's Alleged Deprivation of Toothpaste

Next, Appellants claim that the district court erred in not granting them qualified immunity on Duke and Jerry's claim that the denial of oral hygiene supplies (toothpaste), without attenuated serious medical injury, was a violation of the Boards' established Eighth Amendment rights. We have already held that Farnham is not entitled to qualified immunity because Duke has stated a cause of action under the Eighth Amendment for deprivation of toothpaste for three-and-a-half weeks that constituted deliberate indifference to a current or existing serious medical condition. Thus, as a practical matter, Farnham is not entitled to qualified immunity as to Duke's Eighth Amendment claim even if we were to find that Jerry and Duke have failed to state a claim under a deliberate indifference to a serious medical

need threatening future health rationale. However, for the sake of simplicity we will consider both brothers' claims in concert.

The Boards allege Jail officials violated their constitutional rights when they suffered through the deprivation of toothpaste for extended periods of time (Duke: 3.5 weeks and Jerry: 90% of his stay at the Jail or approximately 16 weeks), and that this deprivation constituted a failure to provide humane treatment. This is a distinct and cognizable constitutional claim under the Eighth Amendment. *See Helling*, 509 U.S. at 34-35 (recognizing claims under the Eighth Amendment for conditions which "pose a serious unreasonable risk of serious damage to [an inmate's] future health."). Therefore, it would be inappropriate for us to analyze this claim under the rubric of attention to present medical needs without evidence of an existing objective harm or injury. *Jackson,* 300 F.3d at 765. Instead, we analyze Duke and Jerry's deprivation of toothpaste claim in the context of the constitutional right of pretrial detainees to receive necessary and proper personal hygiene items as preventative of future medical and physical harm. *See Henderson,* 196 F.3d at 846-47; *see also Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985).

While we have held that the denial of toothpaste for ten days is not sufficient to state an Eighth Amendment claim, *see Harris v. Fleming*, 839 F.2d 1232, 1234 (7th Cir. 1988), other circuit courts have included the right to an adequate supply of toothpaste under a right to hygienic materials. *See, e.g., Penrod*, 94 F.3d at 1405-06. In *Penrod v. Zavaras*, the Tenth Circuit held that the plaintiff had raised a genuine issue of material fact as to whether prison officials' denial of free toothpaste (the plaintiff while incarcerated spent his available funds pursuing legal claims), where the deprivation of toothpaste eventually caused serious harm to his medical needs—specifically recession of the gums and tooth decay—violated the Eighth Amendment. *Id.* at 1406. Also, in

*Green v. Ferrell*, 801 F.2d 765 (5th Cir. 1986), the Fifth Circuit reversed a magistrate's holding that prison officials are required to furnish "additional laundry service and hygienic materials," including toothpaste, where (as in this case) the jail had a policy of providing hygienic materials upon request. *Id.* at 771.

Indeed, the right to toothpaste as an essential hygienic product is analogous to the established right to a nutritionally adequate diet. *See Antonelli*, 81 F.3d at 1432. In *Antonelli v. Sheahan* we held that the deprivation of a nutritional diet could constitute a violation of a prisoner's Eighth Amendment rights. *See id.* This is because requiring that prisoners and pre-trial detainees receive a nutritionally adequate diet assists one in combating illness and contributes to the prevention of future health problems. *See id.* In the same respect, requiring that officials supply needed dental and medical care in the form of oral hygiene products, *i.e.*, toothpaste, also prevents future potentially serious dental problems such as tooth decay and gum infections. Unquestionably, the neglect of one's dental hygiene can, and frequently does, result in objectively serious dental and medical problems, which is illustrated by Duke's need to have a number of his teeth extracted.[7] Therefore, we hold that the Boards, in claiming that they were deprived of toothpaste for long periods of time, have sufficiently alleged the violation of a cognizable constitutional right, which may very well result in an objectively serious harm to future health. *See Cavalieri*, 321 F.3d at 620.

---

[7] As mentioned above, periodontal disease or gingivitis, which is cause by a lack of dental hygiene, is a serious medical condition which is manifested by the loss of teeth. *See supra* note 4. In addition, complications from this condition have been diagnosed as contributing to serious health problems including, but not limited to, heart complications, sepsis and even death.

However, having recognized that a constitutional right to toothpaste exists under certain circumstances, and that the injury caused by such a deprivation may be objectively serious, we must next determine whether Farnham was deliberately indifferent to Duke and Jerry's needs. *See Armstrong*, 152 F.3d at 577. Duke claims he was denied access to toothpaste for three-and-a-half weeks. Jerry claims he was denied toothpaste for 90% of his 126 day stay at the Jail. In addition, Duke and Jerry both claim they complained to Farnham on a number of occasions about the conditions at the Jail, and specifically about the lack of toothpaste and other provisions, to no avail.[8] Specifically,

---

[8] Although Jerry never specifically articulated how many times he requested toothpaste, viewing his testimony (and the facts and circumstances surrounding that testimony) in the light most favorable to Jerry as we must, *see Coady*, 187 F.3d at 730-31, we hold that Jerry has stated a claim of deliberate indifference to a serious medical condition. This conclusion is based, at least in part, on Jerry's personal testimony, in which he stated:

Q: Were there occasions when you did not have any toothpaste?

A: Several. Ninety percent of the time I was there.

Q: Did you ask for toothpaste and was it denied to you?

A: They just didn't have it.

Q: Did you ask a family member to provide toothpaste for you?

A: They don't do that. You can't bring nothing [sic] in like that.

Q: Do you know or have personal knowledge as to whether a family member was provided the ability to provide you with toothpaste?

A: I just told you. We asked if someone could bring us that stuff in. They told us no. You buy it from [the Jail commissary], and that's it.

(continued...)

Duke claims he requested additional toothpaste approximately fifteen times. Viewing the testimony in the light most favorable to Duke and Jerry, as we must, we hold that they have sufficiently alleged a scenario that supports our conclusion that Farnham was both deliberately indifferent to their constitutional rights and was on notice as to their predicament. *See Hall*, 957 F.2d at 404.

Finally, this Court is called upon to conclude whether the constitutional right to oral hygiene products was clearly established at the time of the alleged violations. A clearly established right may be found, in the absence of precedent, when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640. The Eighth Amendment protects prisoners, and thus detainees, from "an official's deliberate indifference to conditions posing an unreasonable risk of serious damage to the prisoner's future health." *Henderson*, 196 F.3d at 847 (citing *Helling*, 509 U.S. at 33-35). We have previously stated that "[d]ental care is one of the most important medical needs of inmates." *Wynn*, 251 F.3d at 593 (quoting *Ramos*, 639 F.2d at 576). Because dental care is a basic human need and the constitutional test requires us to look at "the evolving standards of decency that mark the progress of a maturing society," *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981), Farnham

---

[8] (...continued)
Jerry Board Dep. at 205. Although this statement is fairly ambiguous, viewing the record in the light most favorable to the non-moving party as we must, it is conceivable that a "rational trier of fact" could find that Jerry's testimony established Farnham's deliberate indifference. *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 727 (7th Cir. 2001). Said differently, it is conceivable that a jury could infer that Jerry's response that "[t]hey just didn't have it" meant that he had requested toothpaste and was told that his request was denied by Jail officials.

was or should have been "on notice" and had "fair warning" that it would be unconstitutional for him to deny oral hygiene products to pretrial detainees under his watch for long periods of time. *Hope*, 536 U.S. at 741. We hold that the district court did not err in denying qualified immunity to Farnham based on the alleged denial of toothpaste to Duke and Jerry Board for three-and-a-half weeks and approximately 113 days respectively.

## B.  Duke's Asthma Inhaler

The defendants-appellants also appeal the district court's denial of qualified immunity on one count of deliberate indifference to a serious medical condition arising out of Verchota and Rhoades' alleged failure to provide Duke with his "albuterol" bronchodilator for the treatment and control of asthma attacks. We have previously held that asthma can be, and frequently is, a serious medical condition, depending on the severity of the attacks. *See Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001). In *Garvin*, we assumed for the purposes of that appeal that Garvin's asthmatic condition was sufficiently serious, but his claim failed to sufficiently allege the second prong of our analysis, demonstrating deliberate indifference. *See id.* at 898-99. In another case, *Alvarado v. Litscher*, 267 F.3d 648 (7th Cir. 2001), we recognized asthma as a serious health condition where a prisoner claimed the "environmental tobacco smoke" aggravated his already "severe asthma." *Id.* at 649-53. In addition, other circuits have also found asthma to be a serious medical condition. *See, e.g., Adams v. Poag*, 61 F.3d 1537 (11th Cir. 1995). In *Adams v. Poag,* the United States Court of Appeals for the Eleventh Circuit held that an inmate, Adams, who was a lifelong asthma sufferer and complained of serious attacks every couple days for nearly a month until he died of acute respiratory failure, suffered from a serious medical condition. *Id.* at 1543.

While incarcerated at the Edgar County Jail, Duke's inhaler use increased from one inhaler a month to one inhaler every two days. Duke claims the air quality in the Jail and the denial of his albuterol inhaler[9] exacerbated his asthma causing him to be taken to the emergency room on two separate occasions for his asthma-related problems. He also claims that his condition worsened resulting in severe breathing difficulties that forced him to begin using a breathing machine for the first time in his life. Duke testified that on a number of occasions he was denied the use of his inhaler and that the deprivation of the inhaler nearly killed him. In pertinent part Duke stated:

> There was a—there were times that I would have to say, hey, this [albuterol inhaler] is empty. They would say, well, we'll have to get some more. The pharmacy isn't open tonight. It will be open tomorrow . . . [I would say] that isn't going to work for me, and they would end up having to take me to an emergency room, and they would put me on a breathing machine, because I didn't have my machine. Eventually it got so bad Allen Verchota would not give me my medication when I would ask for it. I would start breathing hard, and I would pound on this wall . . . . Rick [a fellow prisoner] would know what it was for, and Wieland [another fellow prisoner] would start kicking the doors to try to get Allen Verchota to give me my medicine. He wouldn't do it. So eventually the next morning another jailer would come in, and I would be almost frickin' [dead].

Duke Dep. at 165-66. Appellants claim this was due to Duke's use of tobacco while in prison. However, viewing Duke's testimony in the light most favorable to him, we hold that he has sufficiently shown that his asthma was a serious medical condition under the circumstances, threatening both his health at the time and his future health.

---

[9]  *See supr*a note 1.

Next Duke must establish that Verchota and Rhoades were deliberately indifferent to his need for the inhaler. As illustrated above, Duke testified that Verchota "didn't give [the inhaler] to me more times than he did." Duke Dep. at 169. Also, Rhoades allegedly failed to provide the inhaler on more than one occasion, using the excuse that he would give it to Duke "when he got time." Duke Dep. at 169. These allegations are sufficient to establish deliberate indifference for summary judgment purposes. As the we have noted in the past, "deliberate indifference can be evidenced by repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff." *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) (quoting *Ramos*, 639 F.2d at 575). In this case the guards, Verchota and Rhoades, knew or should have known that Duke was suffering from asthma, a serious medical condition, and to refuse the man his inhaler putting Duke at a "serious risk of being harmed"; both guards made a conscious decision not to act when they easily could have. *See Armstrong*, 152 F.3d at 577. Therefore, we hold that, for summary judgment purposes, Duke has sufficiently established the deliberate indifference of the Jail staff to his medical need for his asthma inhaler.

Finally, as discussed above, the right to receive adequate treatment for serious medical needs is a clearly established constitutional right. *See Walker*, 293 F.3d at 1040. There is no doubt that both Verchota and Rhoades were, or should have been "on notice" that refusing an asthma patient his inhaler when he is complaining of severe breathing problems could constitute a deprivation of a pretrial detainee's constitutional rights. *See Hope*, 536 U.S. at 741. At the very least Duke has alleged "pain and suffering . . . [which] is inconsistent with contemporary standards of decency." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Thus, we agree with the district court and hold that the trial judge did not err in denying Verchota and Rhoades qualified immunity

for their alleged violation of Duke's constitutional right to adequate medical attention when they deprived him of his inhaler.

## C. Adequate Ventilation

Finally, the defendants-appellants appeal the district court's denial of qualified immunity based on the Boards' contention that Jail officials failed to provide humane health (breathing) conditions arising out of the allegedly unhealthy condition of the Jail's ventilation system. In the past we have recognized that a constitutional right to adequate ventilation exists, which, while not assuring the right to be free from all discomfort, will be violated if inadequate ventilation can be considered as constituting punishment of pretrial detainees. *Shelby County v. Westlake,* 798 F.2d 1085, 1087 (7th Cir. 1986); *see also Martin v. Tyson,* 845 F.2d 1451, 1456 (7th Cir. 1988).

First, we hold that the alleged extremely poor condition of the inadequate ventilation system at the Edgar County Jail as alleged by the Boards, viewing their allegations in the light most favorable to them, was sufficient to constitute an objectively serious harm to both Duke and Jerry, and thus violated their Eighth Amendment rights. *See Saucier*, 533 U.S. at 201. Duke and Jerry allege that the flow of black fiberglass dust into cells caused numerous nosebleeds and respiratory problems for both Jerry and Duke, as well as other inmates. Duke also alleges that the poor ventilation system exacerbated his serious asthma condition, which was compounded by the denial of his medication, discussed *infra*, and resulted in his being hospitalized and put on a breathing machine. This is harm which may be both a hazard to the Boards' current health (nosebleeds) and which may cause future health problems (worsened asthma or other serious respiratory harm). There is no question that exposing prisoners to conditions such as those described by the Boards "is contrary to current standards of

decency." *Helling*, 509 U.S. at 35. In *Helling*, the Supreme Court went as far as to hold that exposure to environmental tobacco smoke ("ETS"), in certain circumstances, may very likely pose an objectively serious threat to future health sufficient to amount to cruel and unusual punishment. *Id.* at 32-36. This case does not pose nearly as close or abstract a question. The Boards have alleged direct physical manifestation of the harm caused by the poor ventilation, as well as the quite likely possibility for future health problems; therefore, they have satisfied the objective prong of the test for an Eighth Amendment violation.

The Boards also claim that Jail officials were deliberately indifferent to their plight. As evidence of this they cite the affidavit of a heating contractor who visited the Jail and gave an opinion on the state of the ventilation system and repairs that needed to be done. In his opinion, the duct system in the Jail was contaminated with black mold and fiberglass liner and was a health hazard that needed replacement.[10] However, the Boards contend that Farnham decided not to properly repair the problem, but instead only tried to mask the symptoms of the problem by performing a flimsy, non-productive band-aid procedure of merely vacuuming the grates. This, in spite of the fact that the private contractor/inspector, Richard Walker, specifically testified that he told Farnham that the duct work system needed to be replaced in order to cut down on the risk of

---

[10] Richard Walker, a heating and air conditioning contractor, testified in relevant part that he informed Sheriff Farnham that the Jail might have "sick building syndrome" with the amount of fiberglass and bacteria in the air system. He further testified as to the possibility that the ductwork contained black mold. As a remedy he suggested an ultraviolet light system designed to kill airborne bacteria in a ductwork system or, at least, a thorough cleaning of the ductwork system. In Walker's opinion the entire ductwork system needed replacement. (Walker Aff., Plaintiff Exh. 11).

disease and that if the duct system could not be replaced immediately the Jail, at least, needed to "clean the entire ductwork system, not simply where the air comes out." Walker Aff. ¶ 9.

The Boards have alleged facts, which, taken in the light most favorable to their case, put Farnham on notice that the Jail's ventilation system was not only inadequate, but also unhealthy. While there is some question as to whether Farnham could have "avert[ed] the danger easily yet failed to do so,"[11] as is required to find deliberate indifference, the Boards present a version of the facts that would support a claim for deliberate indifference to an objectively unhealthy ventilation system. *See Hall,* 957 F.2d at 404. Indeed, there is sufficient evidence to permit a rational trier of fact to find that even arranging for the ducts to be cleaned (which was not done), as other areas of the Jail are undoubtedly cleaned or maintained, could have helped improve the situation. Thus, we find that sufficient facts have been alleged, that, if proved true, would support a finding of deliberate indifference. *Id.*

Finally, there can be no question that the right to adequate and healthy ventilation was, and has been for some time, a clearly established constitutional right at the time of the Boards' incarceration. For almost two decades this court, as well as other circuit courts, have continually espoused a prisoner's right to adequate ventilation. *See Shelby*, 798 F.2d at 1087; *Benjamin v. Fraser*, 343 F.3d 35, 52 (2d Cir. 2003); *Chandler v. Baird,* 926 F.2d 1057, 1065 (11th Cir. 1991); *Carver v. Knox County*, 887 F.2d 1287, 1293 (6th Cir. 1989). In addition, the Supreme Court has also routinely held that such a right is squarely rooted in

---

[11] *Washington v. Laporte County Sheriff's Dept.*, 306 F.3d 515, 518 (7th Cri. 2002) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

Eighth Amendment principles. *See Helling*, 509 U.S. at 34-36. We therefore, hold that the district court also did not err in denying the defendants-appellants qualified immunity on their adequate ventilation claims.

### III.  CONCLUSION

While the Boards' claims may ultimately fail, we hold that they have presented more than sufficient evidence of alleged constitutional violations to successfully resist a grant of summary judgment to the defendant-appellants on qualified immunity grounds; therefore, the district court's judgment is

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*