In the

# United States Court of Appeals
## For the Seventh Circuit

No. 07-3651

FLYNT J. LEE,

*Plaintiff-Appellant,*

*v.*

DONALD YOUNG, MIKE HICKS, MELINDA
FIELDS, STEVEN CAGLE, and DONALD N.
SNYDER,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 02-CV-281—**J. Phil Gilbert**, *Judge.*

ARGUED MAY 14, 2008—DECIDED JUNE 24, 2008

Before BAUER, FLAUM, and MANION, *Circuit Judges.*

FLAUM, *Circuit Judge.* Flynt Jules Lee is a former prison inmate who suffered from asthma. During his stay at a particular prison, he claims that he was exposed to second-hand smoke that triggered his asthma and exacerbated his respiratory condition. He sued prison officials under 42 U.S.C. § 1983 for exhibiting deliberate indifference to his serious medical needs. The district court granted summary judgment in favor of the defendant prison

officials, finding that Lee in fact could have had a serious medical need, but that the prison officials were not deliberately indifferent to it. We affirm.

## I. Background

From 1989 to 2002, Lee was an inmate in the custody of the Illinois Department of Corrections ("IDOC"). He was housed in the Shawnee Correctional Center ("Shawnee") from 1995 to 1996, and again from 2001 to 2002. It is the latter portion of his stay in Shawnee that is the subject of this litigation. Lee has suffered from chronic asthma since childhood. He claims that his condition worsened while he was in prison due to environmental tobacco smoke ("ETS"). In 1998, he was hospitalized for respiratory failure that presumably arose from his asthma. Later that year, the Acting Medical Director of the IDOC signed a memorandum stating that Lee "has severe asthma and may need prompt medical attention." Two years later, Lee was taken to a non-IDOC emergency room for respiratory problems.

All of this occurred before Lee arrived at Shawnee on January 29, 2001. Upon his arrival, an IDOC health status form was prepared and it listed "acute asthma" as one of his "chronic conditions." The report noted that Lee was already taking several asthma-related medications—namely Accolate, Albuterol, and Azmacort—and continued to participate in an asthma clinic. On February 22, 2001, he was transferred to Shawnee's non-smoking medical unit on account of severe abdominal pain that also caused his asthma to "act up." A related memorandum explicitly acknowledged Lee's "history of having severe asthma attacks . . . ." Once his situation had stabi-

lized soon thereafter, Lee requested to be transferred to a non-smoking cell,[1] and his request was granted.

Unfortunately, Lee was still exposed to ETS. Shawnee did not contain any entirely smoke-free wings (nor was it required to), and so smoke from nearby cells would filter into Lee's cell. What was worse is that Lee's cell-mate smoked even though it was a non-smoking cell. Lee then filed a series of grievances based on the presence of secondhand tobacco smoke. He complained that Shaw-nee "does not have a smoke-free living unit" and that "being placed in a non-smoking cell does not alleviate entirely his exposure to secondhand smoke." On April 20, 2001, a grievance officer recommended approval of the grievance, and the warden concurred several days later and stated that Lee "should be moved to a non-smoking cell." Obviously, Lee responded and notified the warden that he was already in a non-smoking cell, but his cell-mate and others nearby still smoked. Since Shawnee did not have a smoke-free wing, Lee asked to be "transferred to another institution that has a non-smoking wing . . . ." He filed a similar grievance a month later.

In July 2001, a medical doctor was asked to review Lee's records and found no medical problem that "would necessitate special housing placement." Similarly, in August and December 2001, when Lee visited the asthma clinic, the doctor wrote that Lee had no recent asthma attacks and that his asthma was "controlled."

---

[1] In 1994, the IDOC required wardens of each facility to designate a set of non-smoking cells. Inmates were not "permit-ted to smoke or possess smoking materials in non-smoking cells." Twelve cells in nearly each of Shawnee's Housing Unit Wings were designated as non-smoking.

Accordingly, Lee's prescriptions were renewed as before. Still, between November 2001 and December 2002, Lee repeatedly complained about his exposure to ETS to the medical staff. The record reflects over a dozen instances where Lee complained of "smoking inmates," "smoke in his cell," that his "cellmate smokes," and that he had to use his Albuterol inhaler with greater frequency. Prison doctors took note of the fact that he used this inhaler more often, but kept his prescriptions levels essentially intact.[2] Lee lodged his final complaint with medical staff on December 4, 2002.[3] The doctor who saw him on his sick call concluded that Lee's condition had "improved" with Azmacort and that he should continue with his current medications.

Even though inmates at Shawnee were not permitted to possess smoking materials in non-smoking cells, the prison commissary unwittingly sold cigarettes to inmates housed in non-smoking cells. Nevertheless, correctional officers enforced the non-smoking policy by issuing disciplinary tickets to inmates who smoked or possessed smoking materials in non-smoking areas. At some point during Lee's stint at Shawnee, his cellmate was issued a ticket for smoking in their non-smoking cell. In addition, two other inmates were given disciplinary tickets for possessing or using tobacco in non-smoking areas.

---

[2] Lee's Accolate and Albuterol prescriptions remained at the same strength throughout his stay at Shawnee. His Azmacort prescription changed from two puffs, two times a day, to four puffs, two times a day, as it had been back in February 2001.

[3] Lee was released from prison soon thereafter, on December 30, 2002.

Apart from the complaints regarding ETS, Lee also complained about the prison ventilation system. Specifically, on July 9, 2002, he filed a grievance alleging that his housing unit had "no ventilation system working to extract the ETS" which "endanger[ed his] overall health and safety." A grievance officer reported that the exhaust fans were subsequently repaired on August 31, 2002.

Lee initially proceeded *pro se*, and filed his complaint with the district court on April 1, 2002. His second amended complaint was filed on August 4, 2003. He sued defendants Donald Young, former warden at Shawnee; Melinda Fields, former business administrator at Shawnee; Donald Snyder,[4] former director of IDOC; Mike Hicks, commissary supervisor at Shawnee; and Steven Cagle, housing placement officer at Shawnee. Lee alleged violations of 42 U.S.C. § 1983—grounded in his Eighth Amendment right to be free from cruel and unusual punishment—based on exposure to secondhand tobacco smoke. Because of injury to his existing and future health, he seeks compensatory and punitive damages totaling $1.575 million.

Defendants moved for summary judgment. They argued that the asthma was not a serious medical condition, that they did not exhibit deliberate indifference, and that they were entitled to qualified immunity. A magistrate judge issued a Report and Recommendation that summary judgment be denied on the question of whether defendants violated Lee's Eighth Amendment rights, and that summary judgment also be denied on their qualified immunity claim.

---

[4] The district court dismissed Snyder from the suit for lack of personal involvement, and Lee has not articulated any objection to this determination on appeal.

On October 4, 2007, the district court entered its judgment in favor of defendants on all claims and dismissed Lee's claims with prejudice. The trial judge accepted in part and rejected in part the magistrate's Report and Recommendation. He determined that "exposure to ETS caused Lee's asthma to worsen to the point where it became a 'serious medical need.'" But he concluded that "even drawing all reasonable inferences in Lee's favor, no reasonable trier of fact could find that defendants acted with deliberate indifference to Lee's serious medical needs." The district court also added that defendants were entitled to qualified immunity. This appeal followed.

## II. Discussion

Lee raises two issues on appeal. First, he contends that there was a genuine issue of fact as to whether defendants exhibited deliberate indifference to his serious medical needs. Second, he argues that there was also a genuine issue of fact as to whether defendants are entitled to qualified immunity. We analyze each issue in turn.

### A

We review a district court's decision granting summary judgment de novo. *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005). Summary judgment is appropriate where the evidence demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). All facts are construed and all inferences are drawn in favor of the non-moving party. *Greeno*, 414 F.3d at 652.

Deliberate indifference to serious medical needs of prisoners violates the Eighth Amendment, which applies to the states through the Fourteenth Amendment. *Walker v. Benjamin*, 293 F.3d 1030, 1036-37 (7th Cir. 2002). The Eighth Amendment prohibits punishments that are incompatible with "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). In order to prevail on a deliberate indifference claim, a plaintiff must show (1) that his condition was "objectively, sufficiently serious" and (2) that the "prison officials acted with a sufficiently culpable state of mind." *Greeno*, 414 F.3d at 653. A medical condition is serious if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Id.* With respect to the culpable state of mind, negligence or even gross negligence is not enough; the conduct must be reckless in the criminal sense. *Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994) ("We hold . . . that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

As a general matter, asthma "can be, and frequently is, a serious medical condition, depending on the severity of the attacks." *Board v. Farnham*, 394 F.3d 469, 484 (7th Cir. 2005). In *Board*, the defendant was taken to the emergency room on two occasions, began using a breathing machine, and was deprived of his asthma medication which kept

him from defending against asthma attacks. *Id*. at 485. But not all cases of asthma necessarily constitute serious medical needs. In *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999), we affirmed summary judgment in favor of the defendant correctional officers where the plaintiff complained of "breathing problems, chest pains, dizziness, sinus problems, headaches, and a loss of energy" from exposure to ETS. Here, defendants argue that this case is analogous to *Henderson*: Lee did not suffer an asthma attack during the relevant period of time, and he complained mostly of "shortness of breath, watery eyes, sneezing, tightening of the chest, wheezing and coughing." Thus, the argument goes, he did not suffer from a serious medical condition. We disagree.

The district court was correct to conclude that there are enough issues of material fact with respect to the seriousness of the medical condition to be taken to a jury. First, the record is not clear on whether Lee actually suffered an asthma attack while at Shawnee. He was taken to the infirmary in February 2001 for an abdominal problem that caused his asthma to "act up." There is evidence in the record that suggests that some doctors classified his respiratory issue in this instance as a full-blown asthma attack.[5] For instance, at the asthma clinic in February 2002, the doctor noted that Lee's "last serious asthma attack" was "1 yr ago." Second, several doctors did diagnose his asthma as "severe," and the ETS exacerbated his condition. Lee was using his Albuterol inhaler more readily, and the record implies that respiratory examinations showed decreased lung capacity. Further,

---

[5] The medical records, however, do not reflect that this episode was in any way caused by ETS.

Lee was seen repeatedly in the medical unit for breathing problems, he complained regularly of secondhand smoke, and the IDOC was on notice of his condition and that he had gone to the emergency room as a result of it in the past. We find that given this particular set of facts, a reasonable jury could have concluded that Lee had a serious medical need.

Whether defendants exhibited deliberate indifference to this potentially serious medical need is a separate question. Lee argues that defendants' actions here fell short of the mark. He was placed in a non-smoking cell, but he was still exposed to ETS on account of inmates in nearby (smoking) cells who smoked and his own "non-smoking" cellmate. Moreover, he brought both of these facts to the attention of prison officials through the grievance process, but the situation was not ameliorated. Shawnee policy also gave the warden the authority to remove smoking inmates from non-smoking cells or rooms. Lee argues that in spite of this rule's existence, defendants did very little to actually enforce and implement their non-smoking policy. Prison officials could have also, he contends, been more vigilant about keeping tobacco from being sold out of the prison commissary to inmates housed in non-smoking cells. Finally, Lee maintains that the nearly two months that it took to fix the exhaust fan was too long, especially given his condition.

Lee's complaints, while valid, do not rise to the level deliberate indifference or criminal recklessness on the part of the defendants. Prison officials are expected to "act responsibly under the circumstances that confront them" but are not required to act flawlessly. *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004). Significantly, in determining the best way to handle an inmate's medical needs,

prison officials who are not medical professionals are entitled to rely on the opinions of medical professionals. *Johnson v. Doughty*, 433, F.3d 1001, 1011 (7th Cir. 2006). Here, Lee complained on many occasions to the medical staff about his exposure to ETS, but the record does not reveal a single instance where a prison doctor recommended that Lee be transferred to a different cell,[6] or a different prison facility with an entirely non-smoking wing. In fact, a doctor was asked to review Lee's medical history to ascertain whether there was any reason for "special housing placement," and he concluded that there was not. In spite of Lee's protests, not one doctor recommended a shift in his living situation.[7] Furthermore, medical professionals at the asthma clinic uniformly determined that Lee's asthma was "controlled."

Quite apart from the fact that prison officials did not contradict or ignore medical advice regarding Lee's housing, the record is replete with instances of concern, not indifference. Lee was given access to doctors, the asthma clinic, and medications prescribed by his doctors without fail. When a prison doctor recommended that he be moved to the medical wing, he was moved, and when he requested a non-smoking cell, he received (an albeit imperfect) one. In addition, when he complained that his cellmate was smoking in their non-smoking cell, the cellmate was issued a disciplinary ticket. Two others

---

[6] Lee submits affidavits from two nurses that indicate that they called the housing placement office to have his cellmate moved, but there is no evidence that tends to suggest that any of the individual defendants were aware of this request.

[7] Lee has not sued any member of the medical staff—only prison officials are a party to this suit.

were given tickets as well. Finally, when he brought the broken ventilation system to the prison officials' attention, it was repaired soon thereafter.

True, prison officials could have removed Lee's cellmate, ticketed every inmate who smoked in a non-smoking cell, repaired exhaust fans immediately, and constructed a completely non-smoking wing in the prison. But the Eighth Amendment "forbids cruel and unusual punishments; it does not require the most intelligent, progressive, humane, or efficacious prison administration." *Anderson v. Romero*, 72 F.3d 518, 524 (7th Cir. 1995). For instance, in *Greeno*, we held that an inmate who was "vomiting on a regular basis and consuming large quantities of Maalox in an attempt to combat his heartburn, nausea, and vomiting" could prove deliberate indifference on the part of a nurse who withheld Maalox and gave the plaintiff "a medication known to aggravate his esophageal condition," a health services administrator who did nothing in response to plaintiff's complaint that he was unable to "find food that would not irritate his stomach or cause him to vomit," and a doctor who refused "over a two-year period to refer [the plaintiff] to a specialist or authorize an endoscopy" and banned the medical staff from giving the plaintiff any pain medication. 414 F.3d at 654-55. While we do not comment on whether this set of facts constitutes the floor for deliberate indifference, it is clear that Lee's situation is categorically distinct. If Lee brought suit against medical staff, if prison officials contravened doctors' orders, and if the same officials took no steps towards reducing Lee's exposure to ETS, this would be a very different case. Here, Lee brought suit solely against prison officials who happened to follow doctors' orders and who made progress towards re-

ducing his exposure to ETS. Their efforts to do so and the prison policies themselves may not have been perfect, but at worst they can only be said to have been negligent, not reckless in the criminal sense.

## B

While we agree with the district court's overall disposition of the case, we pause to note that we explicitly do not affirm its rulings regarding qualified immunity. We review a district court's determination regarding qualified immunity de novo. *Borello v. Allison*, 446 F.3d 742, 746 (7th Cir. 2006). Qualified immunity is a defense available to government officials performing discretionary functions that affords them protection from civil liability. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A two-part test is used to ascertain whether qualified immunity exists. First, the plaintiff must establish that the actions of the defendant violated his constitutional rights. *Triad Associates, Inc. v. Robinson*, 10 F.3d 492, 496 (7th Cir. 1993). Second, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A plaintiff must show, on some level, that a violation of this right has been found in factually similar cases, or that the violation was so clear that a government official would have known that his actions violated the plaintiff's rights even in the absence of a factually similar case. *Borello*, 446 F.3d at 750.

The district court concluded, in error, that no factually similar cases were on point, and so the contours of the right at issue were not clearly defined. In *Alvarado v. Litscher*, 267 F.3d 648, 653 (7th Cir. 1999), we explicitly

held that "[g]iven the decision in *Helling*, the right of a prisoner to not be subjected to a serious risk of his future health resulting from ETS was clearly established in 1998-99." Since this right was clearly established in 1998-1999, it was also clearly established during the relevant period of time here, 2001-2002. Nevertheless, the district court did not have to rule on the issue of qualified immunity, and neither do we, since the first prong of the test (i.e., defendants violated plaintiff's constitutional rights) has not been met, as detailed above.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment.