# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 03-2973

JAMES E. PINKSTON,

*Plaintiff-Appellant,*

*v.*

ANTHONY MADRY and
JANIENE GRISSELLE,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:00 CV 090 RM—**Robert L. Miller, Jr.,** *Chief Judge.*

ARGUED DECEMBER 2, 2004—DECIDED MARCH 14, 2006

Before COFFEY, RIPPLE and MANION, *Circuit Judges.*

COFFEY, *Circuit Judge.* On May 3, 2000, James Pinkston filed a complaint in federal court pursuant to 42 U.S.C. § 1983 alleging that two correctional officers at the Indiana Department of Corrections Maximum Control Complex in Westville, Indiana, violated his Eighth Amendment rights when they allowed another prisoner to assault him and thereafter refused to assist him in receiving adequate medical care. While discovery was underway, the district court assigned a magistrate judge to dispense with all non-dispositive matters and to file proposed findings of fact and conclusions of law. *See* 28 U.S.C. § 636(b)(1)(B). The magistrate judge subsequently

convened an evidentiary hearing and, after performing a *de novo* review of the evidentiary hearing transcript and the magistrate judge's recommendations, the district court adopted the magistrate judge's decision granting the defendants-appellees motion for "Judgment on Partial Findings" under Federal Rules of Civil Procedure 52(c). We affirm.

## I. BACKGROUND

At all times relevant to this appeal Pinkston was confined at the Indiana Department of Corrections Maximum Control Complex ("MCC") in Westville, Indiana, a maximum security prison operated as an institution to confine the most aggressive criminals in the Indiana prison system.[1] While incarcerated at the facility, Pinkston had a number of acrimonious and brutal run-ins with corrections officers as well as fellow inmates.[2]

Sometime in September of 1999, Pinkston commenced to harbor animosity towards Corrections Officer Anthony Madry. On or about September 16, 1999, Pinkston allegedly witnessed Madry returning a pair of sweatpants that he had laundered for another inmate, Dana Smith. Feeling left out, Pinkston asked Madry to wash his sweats as well, but that request was summarily denied.

---

[1] Correctional Officer Madry, a defendant in this action, testified at the evidentiary hearing that, before being reassigned to the MCC, the criminals "had to be at another prison [previously], [where they had] committed assault on an officer or another offender, or [had been] involved in some kind of riot, or something like that." Pinkston became eligible for placement in the MCC after he attacked another inmate with a weapon.

[2] In 1997, Pinkston attacked another offender with a weapon and testified that he regularly "got into . . . fights."

On the morning of September 17, 1999, with tensions somewhat charged from the events of the previous day, Smith and Pinkston began trading insults back and forth from their adjacent cells. In hopes of avoiding the possibility of being alone with Smith, Pinkston chose to go to the showers that afternoon instead of going to recreation. Officer Madry was assigned to accompany Pinkston to the shower facility and, according to Pinkston, while Madry was shackling him for transport he (Madry) intentionally left his handcuffs "loose." Then, during the walk to the showers, Pinkston claims that Madry encouraged him to "slip his cuffs" as a sign of aggression so that Madry would be justified in engaging in an altercation with him. Pinkston refused to do so and, after showering, requested that two different officers escort him back to his cell. The guards eventually acquiesced, and Pinkston was returned to his cell without incident.

The events of September 19, 1999, however, are the impetus of this lawsuit. Pinkston claims that, after he showered, Madry began yelling at him, telling him that he was going to "whoop him." Another officer, Officer Chapman, allegedly joined Pinkston and Madry in the shower area with baton in hand, and Pinkston claims that he became frightened that the officers might "jump" him. However, nothing happened and he was led back to his cell without incident.

What happened next is the subject of dispute. Pinkston claims that later that day (September 19th) he was again approached by Madry, this time while he was locked in his cell. Madry allegedly spoke to Pinkston, with Smith in earshot, intimating that he was going to unlock the doors of the two inmates cells so that Smith and Pinkston could fight it out. At some point in the next few minutes, Madry walked away and the doors to Smith and Pinkston's cells opened. With other inmates watching, the two allegedly

engaged in fisticuffs, with Pinkston receiving a punch to the face from Smith, injuring his lip and drawing blood.

According to Pinkston, while the fight was going on Madry and another officer, Officer Janiene Grisselle, observed the melee from the control room and, as a result, Madry immediately went down to investigate.[3] As Madry approached, the tussle ceased and Pinkston returned to his cell. Madry located a mop and cleaned up the blood on the floor. While he was doing this, Pinkston requested that he be allowed to see the nurse. Madry allegedly responded flippantly[4] and returned to the control room when he was finished cleaning up. After Madry returned to the control room, Grisselle walked down to Pinkston's cell and assessed his wounds. Grisselle then secured some Band-Aids, tape, and ice from the nurse's station, returned to Pinkston's cell and proceeded to treat his lip with a bandage and an alcohol pad while attempting to calm him down. The nurse was not called at that time, but Grisselle did return later to re-dress Pinkston's lip.

Approximately four days later, on September 23, 1999, Pinkston submitted a formal medical request as well as a form requesting a conference with a counselor. The following day, Pinkston was interviewed by Rosanne Downey-Zinkan a behavioral clinician, who discussed the incident with Pinkston and observed that he had an "injury to [his] lip, puffy, and injury about [his] eye; both on the left

---

[3]  A shift change occurred and Officer Chapman had been replaced by Officer Janiene Grisselle.

[4]  Pinkston claims that Madry stated: "That's what happens to little bitches. You better lay down and take that ass kicking."

side [of his face]."[5] The clinician suggested that Pinkston seek medical help, if he felt that was necessary, and advised him that he might want to file a grievance, if he was so inclined. Pinkston followed this advice and, on September 24, 1999, filed a grievance with the prison's administration, which was denied as untimely.[6]

On September 29, 1999, Pinkston was again examined, this time by a nurse who described him in her report as being "very uncooperative" and noted that, at that time, she observed no "redness, swelling or discharge" on the left side of his face. She went on to note that, when Pinkston was "asked how [the] injury occurred and where other injuries are located [he] stood up and left the room," without answering. Two days later, Pinkston submitted a second written medical request. Upon receipt, the nurse on duty requested that an x-ray of Pinkston's facial area be performed in order to rule out a broken jaw. The prison's doctor agreed with the recommendation and ordered an x-ray, scheduling it for October 6, 1999. However, Pinkston refused the x-ray procedure in writing when he submitted a third health care request form on October 5, 1999, in which he wrote that he didn't "need an x-ray" because he didn't "have a fracture[d] jaw."[7] Instead, Pinkston averred that he "just wanted to be seen under confidentiality, and have it noted [sic] about the injuries [he] received from the assault." On October 8, 1999, Pinkston filed a fourth medical request form complaining that his "jaw [was] still

---

[5] Downey-Zinkan also had a follow up meeting with Pinkston on October 5, 1999, after which she noted that his "[l]ip was not swollen, [and that the] facial discoloration was gone."

[6] According to prison regulations all grievances must be submitted within 48 hours of the alleged incident.

[7] In addition, Pinkston also refused x-rays on October 12, 1999, and October 14, 1999.

swollen." That request was granted and the doctor agreed to see Pinkston on October 14, 1999, but apparently Pinkston once again refused medical attention, for in his file it is noted that he "refused to be seen by the M.D."[8]

On October 20, 1999, Pinkston wrote the superintendent of the prison alleging that Officers Madry and Grisselle allowed another inmate to assault him and requested that his complaint be investigated. On November 21, 1999, a formal investigation was launched by Investigator Surney of the Indiana Department of Corrections. Surney later submitted a report, concluding that "[d]ue to lack of evidence and [Pinkston's] unwillingness to cooperate with the medical staff, this writer finds the incident to be unfounded and without merit."

Not happy with the outcome of the Department of Correction's investigation, Pinkston filed suit in the United States District Court for the Northern District of Indiana on February 9, 2000. In his *pro se* complaint Pinkston asserted that Officers Madry and Grisselle had violated his Eighth Amendment rights on September 19, 1999, when they: (1) failed to protect him from inmate Smith who attacked him and; (2) failed to provide him with adequate medical care following the incident. Following discovery and an unsuccessful motion by the defendants for summary judgment, the case was referred to a magistrate judge on August 6, 2002, for disposition of all dispositive and non-dispositive matters. *See* 28 U.S.C. § 636(b)(1)(B).

The assigned magistrate judge, Judge Nuechterlein, ordered an evidentiary hearing. At the hearing, on April 30-May 1, 1999, Pinkston presented a number of witnesses, including a fellow inmate, John Meriweather, and four prison employees, Officers Jeffery Caldwell and Michael

---

[8] Although the record is somewhat unclear, it appears that Pinkston was examined in person by medical staff on at least two occasions. *See supra* pp. 4-5.

Walker, Nurse Michelle Conrad, and behavioral clinician Rosanne Downey-Zinkan. Of these witnesses, Meriweather was the only person that claimed to have actually witnessed the attack. While he could not be "specific on the date" of the fight and acknowledged that he did not actually "see the incident" due to the position of his cell, Meriweather testified that from his cell he "could hear somebody . . . fighting" in the vicinity of Pinkston's cell on or about the 19th of September, 1999.

After presenting his witnesses, Pinkston also testified on his own behalf in a narrative, during which Judge Nuechterlein felt it was necessary to ask a number of questions in an attempt to clarify portions of his testimony. Specifically, Pinkston testified that, around 7:00 pm on September 19, 1999, Officer Madry was the only officer left on the cell block after a shift change had occurred. Pinkston stated that, shortly thereafter, he had a brief conversation with inmate Smith and then proceeded to the control tower where he "gave power to [Pinkston's] door," causing it to open. At that point, Pinkston told the court that he walked out of his cell where he and inmate Smith "fought three times . . . it was like wrassling [sic] and stuff." According to Pinkston it was Madry who went down to the area where the fight was taking place to "break it up," but stated that before the fight was interrupted Smith "hit [him] in the mouth and split [his] lip." Pinkston then informed the court that, after the fight ended, he retreated to his cell while Madry "grabbed a mop and started mopping up the blood."[9] In addition, Pinkston specifically testified concerning

---

[9]  Pinkston added that, while he was mopping up the blood, Madry was taunting him, saying things like "[y]ou better lay down that take that [explicative deleted] beating," and congratulating Smith, telling him that he "got [sic] him good."

Officer Grisselle's absence during or prior to the fight,[10] as well as her appearance afterwards and efforts to supply Pinkston with medical assistance on two different occasions. On cross-examination, Pinkston also made clear that Madry did not, at any point, strike him and he was not claiming that Madry ever directly physically harmed him.

At the close of Pinkston's presentation of his case, Madry and Grisselle moved for judgement on partial findings pursuant to Fed. R. Civ. P. 52(c). The court granted the motion, in part, finding that Pinkston had failed to carry his burden of establishing by a preponderance of the evidence that either Madry or Grisselle had been deliberately indifferent to his serious medical need following his fight with Smith. *See Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001). Specifically, the magistrate judge concluded that: (a) Pinkston's claims of a split or bloody lip and bruising on his back were insufficient to qualify as a "serious medical need"; (b) facts and evidence produced at the hearing established that Pinkston waited a prolonged period of time (4-5 days) before he formally requested medical attention severely undermined his assertion that his injury was serious; and (c) the fact that Pinkston was uncooperative and unreceptive when medical treatment was offered in response to his requests belied his claim of deliberate indifference to a serious medical need on the part of prison officials.[11] In addition, the magistrate verbally

---

[10] For example, when asked whether he was, in any way, claiming that Officer Grisselle was involved in allowing the fight with Smith to take place, Pinkston stated that "she didn't [sic] do nothing . . . I don't think she had any knowledge of it . . . . She didn't even know it was going to happen."

[11] In addition, in his written submission of findings of fact and conclusions of law, the magistrate judge cited Pinkston's testimony that, on at least two occasions, Grisselle "administered
(continued...)

granted the defense's motion to dismiss Grisselle from the suit pursuant to Rule 52(c), finding that Pinkston had not established that Grisselle had failed to protect him.[12] Nevertheless, because the magistrate felt that there was some degree of uncertainty in the evidence presented as to Madry's specific role in the fight, i.e., whether Madry purposely allowed Smith to attack Pinkston in hopes that Pinkston would be harmed, the magistrate judge declined to render any judgment on Madry's motion for judgment on partial findings until the close of the defense's case. *See* Fed. R. Civ. P. 52(c).

The defense called only one witness, Officer Madry, during its presentation at the evidentiary hearing. Madry testified that he recalled "exchanging words" and trading "negative comments; that type of thing" with Pinkston, but denied instigating or allowing the fight to take place between Pinkston and Smith. In addition, Madry corroborated testimony given by two other prison guards (Caldwell and Surney), stating that it took two officers to activate the locking devices in order to open an inmate's cell and that one officer, on his own, could not open a cell door (in contrast to Pinkston's assertion that Officer Madry opened his cell door without assistance from anyone outside the cell block's control room).[13] Madry concluded his testimony by

---

[11] (...continued)
medical aid to [Pinkston's] injuries."

[12] Indeed, Pinkston himself testified that Grisselle was not present in the cell block at the time that his fight with Smith took place. *See supra* p. 8 n.10 and accompanying text.

[13] Specifically, Madry testified that the process of opening an inmate's cell required two people: one officer, located in the control room which overlooks the cell block, to "give power" to the cell door, and another guard, positioned right outside the cell, to push a button that—when activated at the same time as

(continued...)

stating that he was unable to explain why that day's time sheets had not been filled out and filed, although it was official policy to document all operations in the cell block.[14] After Madry's testimony, the defense rested and the magistrate judge—without rendering judgment on Madry's motion for judgment on the findings under Fed. R. Civ. P. 52(c)—retired to prepare written findings of fact and conclusions of law in accordance with the district judge's instructions and 28 U.S.C. § 636(b)(1)(B).

On May 13, 2003, Magistrate Judge Nuechterlein issued his written findings of fact and conclusions of law. In that document, the magistrate judge reiterated his previous findings, including his decision to grant Grisselle and Madry judgment on partial findings based on Pinkston's failure to provide medical care claim. *See supra* p. 7-8. In addition, the judge also found that the defense was entitled to judgment under Rule 52(c) on Pinkston's failure to protect claim. The judge repeated his finding that, according to Pinkston's own testimony, Grisselle was not present in the cell block during the time period when the fight took place and, therefore, could not be responsible for the fight, much less held liable under § 1983. Further, the magistrate judge concluded that, despite Madry's "unconvincing memory lapses" concerning the events of September 19,

---

[13] (...continued)
the button in the control room—would open the cell door. Thus, it was physically, as well as mechanically, impossible for one person standing in the control room to open any cell door, including Pinkston's, on his own; that is, without assistance from another person standing right in front of the cell pushing the corresponding button.

[14] Indeed, Madry was unable to recall many details concerning the events of September 19, 1999, such as what time Officer Grisselle left the cell block and when—or if—the prisoners were taken for showers or recreation that day.

1999, Pinkston had not established that Madry had violated his Eighth Amendment right by failing to protect him from a substantial risk of serious harm. Explaining this conclusion, the magistrate cited: (a) the fact that Madry would not have been able to open Pinkston's cell door from the control room without the assistance of another guard in a different area of the cell block; (b) Pinkston's failure to timely report the supposedly serious injuries he incurred from the fight until September 23, five days thereafter; and (c) the lack of evidence corroborating Pinkston's version of events—except for the vague testimony of fellow inmate John Meriweather, who testified that he did not see the fight, only overheard it and could not state with any specificity what took place prior to or during the incident. Having so concluded, the magistrate judge recommended that the district court enter judgment in favor of the defendants.

Following receipt of the magistrate's recommendation, Pinkston filed a number of hand-written objections to the recommendation with the district court. On July 3, 2003, Chief Judge Robert L. Miller, Jr., after reviewing the magistrate's report as well as Pinkston's objections, entered judgment in favor of the defendants. In his order, Judge Miller wrote the following:

> Having thoroughly reviewed the plaintiff's objections to [the] United States Magistrate Judge's report and recommendation of May 13, 2003, and having conducted a de novo review of the transcript of the evidentiary hearing conducted on April 30 and May 1, 2003, the court finds itself in complete agreement with the reasoning and result of the report and recommendation. The court therefore OVERRULES the plaintiff's objections (filed May 28, 2003). Having no difficulty in reading the handwritten objections, the court also DENIES the plaintiff's motion (filed May 28, 2003) for additional time within which to submit a typed version.

The court ADOPTS the magistrate judge's report and recommendation and directs that judgment be entered for both defendants and against the plaintiff.

SO ORDERED.

*Pinkston v. Madry*, No. 3:00CV0090RM (N.D. Ill. July 3, 2003). Pinkston timely appealed.

## II.  ISSUES

On appeal Pinkston argues that the district court erred in adopting the magistrate's finding that Pinkston had not established by a preponderance of the evidence his § 1983 claims for failure to protect and deliberate indifference to a serious medical need. Pinkston also claims that the procedure that the district court employed in adopting the magistrate's recommendations violated both the spirit and letter of 28 U.S.C. § 636(b)(1)(B). Specifically, Pinkston argues that the district court erred by allowing the magistrate judge to conduct a "quasi bench trial rather than an evidentiary hearing." Also, Pinkston claims that instead of "rubber stamping" the magistrate's decision, the district court should have conducted a more thorough review of the evidentiary hearing.

## III.  DISCUSSION

The district court adopted the magistrate judge's grant of the defendant-appellant's motion for Judgment on Partial Findings pursuant to Fed. R. Civ. P. 52(c). Rule 52(c) provides that:

If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law

> be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law . . . .

*Id.* When reviewing a judgment premised on Rule 52(c), the district court's factual findings—adopted from the magistrate judge's recommendation—are reviewed for clear error only. *See Collins v. Ralston Purina Co.*, 147 F.3d 592, 599 (7th Cir. 1998); *Hirsch v. Burke*, 40 F.3d 900, 903 (7th Cir. 1994); *Zeige Distributing Co. v. All Kitchens, Inc.*, 63 F.3d 609, 612 (7th Cir. 1995). In addition, where the district court "correctly states the law, then his findings as to whether the facts meet the legal standard will be disturbed only if they are clearly erroneous." *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1269 (7th Cir. 1991) (citing *Pullman-Standard v. Swint*, 456 U.S. 273, 288 (1982) and *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)). Under the clearly erroneous standard we may not "reverse the finding of the trier of fact simply because . . . [we] would have decided the case differently." *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985). Instead, we are required to affirm the district court's judgment "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety." *Id.* at 573-74. Clear error is an extremely deferential standard of review, and will only be found to exist where the "reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

## A. *Pinkston's § 1983 Claims*

Pinkston's initial argument on appeal is that it was clear error for the district court to adopt the magistrate's

finding that neither of the guards, Madry or Grisselle, violated Pinkston's Eighth Amendment rights by allegedly failing to protect him from his attacker and failing to provide timely and adequate medical care to him following the altercation. For simplicity's sake, we discuss each of his Eighth Amendment claims in turn.

1. Failure to Protect

Pinkston argues that it was clear error for the district court to adopt the magistrate's determination that he failed to establish that either Madry or Grisselle had failed to protect him from a serious risk of physical harm by allowing a fight to occur between inmate Smith and himself. Specifically, Pinkston argues that he carried his burden by demonstrating that Madry had the ability, as well as the opportunity, to singlehandedly open the prisoners' cells so that a fight could take place. Going further out on a limb, Pinkston also claims on appeal that he established that Grisselle was either a direct participant or was complicit in the attack. We disagree and find no merit to either of these assertions.

As the Supreme Court has recognized, "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quoting *Cortes-Quinones v. Jimenez- Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id*. at 834. In order to state a claim under the Eighth Amendment for failure to protect, a plaintiff bears the burden of establishing prison officials were "deliberately indifferent" to the fact that an inmate was in serious peril of being harmed. *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005); *see Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999). In other words, in order to prevail, Pinkston must demonstrate that

he " 'was at serious risk of being harmed [and Madry and Grisselle] decided not to do anything to prevent that harm from occurring even though [they] could have easily done so.' " *Board*, 394 F.3d at 478. (quoting *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). However, "conduct that simply amounts to 'mere negligence or inadvertence' is insufficient to justify the imposition of liability." *Watts v. Laurent*, 774 F.2d 168, 172 (7th Cir. 1985) (quoting *Estate of Davis v. Johnson*, 745 F.2d 1066, 1070 (7th Cir. 1984)). Instead, "[i]n order to infer callous indifference when an official fails to protect a prisoner from the risk of attack, there must be a 'strong likelihood' rather than a 'mere possibility' that violence will occur." *Id.*

At the evidentiary hearing Pinkston failed to establish that Madry and/or Grisselle failed to protect him from a situation in which there was a "strong likelihood" that violence would occur. *Id.* As the magistrate judge pointed out in his recommendation to the district court, Pinkston failed to establish by a preponderance of the evidence that Madry could have opened the cell door on his own/without assistance and, as Pinkston himself stated, Grisselle wasn't even present in the cell block area when his cell door was opened. When asked at the evidentiary hearing whether he was "seeking damage [sic] from former officer Grisselle for opening the cell door," Pinkston in fact stated that "she didn't have nothing [sic] to do with that part." In addition, no less than three witnesses—Officers Madry and Caldwell, along with Department of Corrections investigator Surney—testified at the evidentiary hearing concerning the locking mechanism on the cell doors. Specifically, each witness testified that, in order to open a particular inmate's cell, one officer needs to be located in the control room "giving power" to the door with the pushing of a button, and another officer must be stationed directly in front of the inmate's door simultaneously depressing another button. *See supra* p. 10 n.13.

During the hearing neither Pinkston nor his witnesses could identify any other guards that were present on the cell block at the time of his fight with Smith, that would have been in a position to help Madry open the cell door. Nonetheless, in his brief, without citing any support in the record, Pinkston argues that the magistrate judge should have credited Pinkston's testimony that Madry could have opened his cell from the control room by himself, over that of at least two other credible witnesses.[15] However, the procedural posture of this case falls under a judgment on partial findings under Rule 52(c), not summary judgment under Rule 56. Unlike summary judgment which requires that judgment be rendered as a matter of law, a trial court ruling on a motion for judgment on partial findings under Rule 52(c) is acting in the capacity of a finder of fact, weighing evidence and assessing the credibility of the

---

[15] In a related argument, Pinkston claims that the magistrate judge precluded him from calling additional witnesses to testify as to the events of September 19, 1999. However, it is clear from the record that the magistrate judge did no such thing. Prior to the evidentiary hearing the magistrate judge informed Pinkston via letter that he would not be allowed to call "several prisoners to testify to the *same* thing." This was a reasonable determination by the magistrate judge, who was simply trying to preclude the introduction of cumulative or repetitive testimony and thus conserve judicial resources; Pinkston was in no way prejudiced during the evidentiary hearing by the magistrate judge's determination. *See Horton v. Litscher*, 427 F.3d 498, 507-08 n.15 (7th Cir. 2005); *see also United States v. Orr*, 825 F.2d 1537, 1540 (11th Cir. 1987) (stating that a trial court judge may limit testimony where cumulative and when defendant had substantial opportunity to expose witness' potential biases). Nevertheless, because Pinkston failed to object to the magistrate judge's order prior to, during or after the hearing, the issue has been waived. *See, e.g.*, *Wernsing v. Thompson,* 423 F.3d 732, 751 (7th Cir. 2005); *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 530 (7th Cir. 2005); *Williams v. REP Corp.*, 302 F.3d 660, 666 (7th Cir. 2002).

witnesses. *See United States v. $242,484.00*, 389 F.3d 1149, 1172 (11th Cir. 2004) (citing *Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1504 (11th Cir. 1993)); *see also Furth v. Inc. Publishing Corp.*, 823 F.2d 1178, 1179 (7th Cir. 1987). Accordingly, appellate review of a judgment rendered under Rule 52(c) is for clear error only, and we afford the plaintiff no special deference and need not draw any inferences in his favor. *See Int'l Union of Operating Engineers, Local 103 v. Indiana Constr. Corp.*, 13 F.3d 253, 257 (7th Cir. 1994) (holding that the district "court is within its prerogative 'to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies.' ") (quoting *Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1475 (7th Cir. 1993)).

Pinkston has failed to present us with any evidence which would bolster his speculative claim that Madry could have opened his cell door without the assistance of another guard, thus allowing the fight to occur. Further, the record is barren of any evidence which would suggest that there was another guard present on the cell block who could have assisted Madry in the opening of the cell door. Thus, after considering the evidence of record and the transcript of the hearing, it was not error, much less clear error for the district court to adopt the magistrate judge's recommendation that the defendants were entitled to judgment on partial findings as to the failure to protect portion of Pinkston's claim.[16]

---

[16] In a tag-along argument, Pinkston claims that the district court should have somehow surmised from Pinkston's testimony that another, unidentified guard or other person, helped Madry open his cell so that the fight could take place. However, at the evidentiary hearing Pinkston specifically renounced this newly introduced theory, stating that he could not, and would not, identify any other person that may have assisted Madry in

(continued...)

2.  Deliberate Indifference to a Serious Medical Need

Next, Pinkston claims that the district court judge erred in adopting the magistrate's conclusion that neither Madry nor Grisselle violated his Eighth Amendment rights by refusing him adequate medical attention following the fisticuffs with Smith. Specifically, Pinkston argues that the magistrate's determination that his swollen cheek, combined with his split lip did not rise to the level of an objectively serious medical condition, constituted clear error. Pinkston maintains, not only that his split lip and swollen cheek constituted an objectively serious medical need, but also that Madry and Grisselle were deliberately indifferent to that need by failing to request or provide adequate medical care. We disagree.

As the magistrate judge noted, in order to prevail on an Eighth Amendment claim for failure to provide medical care, a plaintiff has the burden of demonstrating that "(1) the harm to the plaintiff was objectively serious; and (2) the official was deliberately indifferent to her health or safety." *Board*, 394 F.3d at 478, *accord Farmer*, 511 U.S. at 834-37. At the evidentiary hearing Pinkston failed to establish either prong of this long-standing test.

Initially, we note this court has held that injuries, such as those alleged by Pinkston—a split lip and a swollen cheek—do not rise to the level of an objectively serious medical need. For example, in *Davis v. Jones*, this court held that a one-inch laceration to an arrestee's temple, that was neither deep enough or long enough to require stitches,

---

[16] (...continued)
opening the door. In addition, an unidentified guard would not helped Pinkston's case, for in order to prevail on a § 1983 claim a plaintiff must identify those individuals who have allegedly violated a constitutional right. *See Harper v. Albert*, 400 F.3d 1052, 1066 (7th Cir. 2005).

and a scraped elbow did not require prompt medical attention under the Eighth Amendment. *See Davis v. Jones*, 936 F.2d 971, 972-73 (7th Cir. 1991). In sum, Pinkston's split lip and swollen cheek do not qualify as injuries that are "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Wynn*, 251 F.3d at 593.

Furthermore, even if we were to assume, for purposes of argument only, that Pinkston has indeed somehow established an objectively serious medical need, he has certainly failed to demonstrate that Madry and Grisselle were deliberately indifferent to that hypothetical need. *See Board*, 394 F.3d at 478; *see also Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1420 (7th Cir. 1987) (holding that: "[w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even greater deference to the trial court's findings; for only the trial judge [is in a position to be] aware of the variations in demeanor including but not limited to the actions, mannerisms, and facial expressions that bear so heavily on the listener's understanding of and belief in what is said."); *United States v. Woods*, 233 F.3d 482, 484 (7th Cir. 2000) (holding that we will not second-guess the credibility determinations of a trial judge, because "*he or she has the 'opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements,' as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record.*") (emphasis in original) (citations omitted). The record clearly supports the conclusion that Madry and Grisselle both undertook necessary steps to treat Pinkston for his injuries immediately after the altercation with Smith took place. For instance, Pinkston himself testified that after Madry "went into the control booth," Grisselle came to

his cell "looked at [his] lip, and then went into the nurse's station and got some skin closures, some Band-Aids, some tape, [and] some ice." After securing the medical supplies, Pinkston testified that Grisselle entered his cell and "taped and bandaged" his split lip. Further, Pinkston testified that Grisselle returned shortly thereafter, assessed his condition, and secured additional "medical supplies" in order to change the dressing on his lip. There was nothing indifferent, much less deliberately indifferent about the care and treatment offered by the officers that day. *See Wynn*, 251 F.3d at 593; *Farmer*, 511 U.S. at 835 (stating that "deliberate indifference entails something more than mere negligence.")

What's more, the record establishes that if anyone was indifferent to Pinkston's injuries, it was Pinkston himself.[17] It is undisputed that Pinkston failed to formally request medical attention until approximately four days after the altercation took place—the fight allegedly took place on September 19, 1999, and despite the fact that he was allegedly "seriously injured" Pinkston did not submit a medical attention request form until September 23, 1999. Citing this fact, the magistrate judge correctly concluded that *even Pinkston* did not consider his injuries serious enough that they rose "to the level of injuries which [were] life threatening or pose[d] a risk of needless pain or lingering disability if not treated at once as required by the Eighth Amendment." *Pinkston v. Grisselle*, No. 3:00-CV-090RM at *8 (N.D. Ind. May 13, 2003); *see Davis v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991). Thus, summoning the services of a physician/surgeon was not necessary under the

---

[17] Indeed, the lackadaisical and even obstinate attitude that Pinkston exhibited towards his requests for medical help regarding his on-again/off-again "serious" injuries in the days following the fight is compelling evidence that those injuries were, in fact, very minor.

factual situation presented, for "a prison official cannot be found liable . . . for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. In addition, the record is replete with repeated instances of Pinkston being most uncooperative with medical staff and refusing medical assistance when it was offered to him, such as the various occasions on which he refused doctor-ordered x-rays to assist in determining whether or not any bones in his face had been broken. *See supra* p. 5-6.

Thus, because the record is most clear that Pinkston's injuries were not objectively serious and because the prison staff's actions were anything but deliberately indifferent, the district court did not commit clear error, or err in any way, when adopting the magistrate judge's finding that Pinkston's failure to provide medical attention claim should fail.

## B.   The District Court's Adoption of the Magistrate Judge's Recommendation

Pinkston also claims that the district court violated 28 U.S.C. § 636(b)(1)(B) by allowing the magistrate judge to conduct a "quasi bench trial rather than an evidentiary hearing" and that the court erred by "rubber stamping" the magistrate's decision rather than conducting a more thorough *de novo* review of the evidentiary hearing. This is rather innovative, yet arrantly unavailing argument.

Section 636(b)(1)(B) of Title 28 specifically provides that a district court judge "may designate a magistrate judge to conduct hearings, including evidentiary hearing, and to submit to a judge of the court proposed findings of

fact and recommendations for the disposition . . . of any motion excepted in subparagraph (A) . . . ." This is exactly what Judge Miller did when he drafted his order instructing Magistrate Judge Nuechterlein to "conduct such proceedings as are required and, when appropriate, enter into the record a written order setting forth the disposition of all nondispositive pretrial matters now pending . . . and further to conduct hearings, including evidentiary hearings and trial, and to submit proposed findings of fact and recommendations for the disposition of the plaintiff's complaint pursuant to 28 U.S.C. § 636(b)(3)."

As Pinkston correctly points out, 28 U.S.C. § 636(b)(3) requires that a magistrate judge must procure "the consent of the parties" in order to conduct a bench trial. *Members v. Paige*, 140 F.3d 699, 701 (7th Cir. 1998). However, that point was never reached in this case. A trial did not become a necessity because, after the hearing, the magistrate judge recommended—and the district court agreed— that the judgment would be entered pursuant to Fed. R. Civ. P. 52(c). *See id.* (stating that "because the plaintiff is a prisoner and the case concerns 'conditions of confinement' . . . the judge could refer the case to a magistrate judge for a hearing and recommendation under § 636(b)(1)(B), subject to *de novo* review by the district judge"). Thus, since the magistrate judge was acting well within the scope of his authority and jurisdiction pursuant to § 636(b)(1)(B) by overseeing the commencement of an evidentiary hearing, Pinkston's musings about the requirements of 28 U.S.C. § 636(b)(3) are superfluous. In addition, any claim by Pinkston that the magistrate judge conducted a "quasi bench trial" is misplaced, for the evidentiary hearing that was convened was well within the strictures of § 636(b)(1)(B), as was the magistrate's recommendation to the district judge that judgment be entered under Rule 52(c). *See, e.g.*, *McCarthy v. Bronson,*

500 U.S. 136, 140-44 (1991)*; Goffman v. Gross*, 59 F.3d 668, 670-672 (7th Cir. 1995).

Finally, Pinkston quibbles with what he sarcastically characterizes as the district court's "rubber stamping" of the magistrate judge's proposed findings of fact and recommendations for disposition. We disagree.

Section 636(b)(1) of Title 28 requires that, where a party files written objections to a magistrate judge's proposed findings or recommendations, "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." This means that while the statute requires a "de novo determination" by the district court, a "de novo hearing" is not required. *United States v. Raddatz*, 447 U.S. 667, 674 (1980). As the Supreme Court stated in *Raddatz*, there is "nothing in the legislative history of the statute to support the contention that the judge is required to rehear the contested testimony in order to carry out the statutory command to make the required 'determination.'" *Id*.

Here Judge Miller complied with both the spirit and the letter of the statute by performing a "*de novo* review of the transcript of the evidentiary hearing conducted on April 30 and May 1, 2003." And, as evinced by his statement that he had "no difficulty in reading the handwritten objections," it is clear that Judge Miller conducted a thorough review of all objections and responses made by Pinkston to the magistrate judge's recommendation. *See Goffman*, 59 F.3d at 671 (stating that "if following a review of the record the district court is satisfied with the magistrate judge's findings and recommendations it may in its discretion treat those findings and recommendations as its own"); *see also United States v. Larson*, 760 F.2d 852, 857 (8th Cir. 1985); *Andrews v. Deland*, 943 F.2d 1162, 1170-71 (10th Cir. 1991). It is clear that Pinkston's argument in this regard is

nothing more than a collateral attack on the magistrate's reasoning, masquerading as an assault on the district court's entirely acceptable decision to adopt the magistrate's opinion instead of conducting an evidentiary hearing on its own. However, the law requires the district judge to do no such thing. *See Raddatz*, 447 U.S. at 674.

Despite Pinkston's suggestion that we should do otherwise, Judge Miller is a most knowledgeable, experienced and well-respected Article III judge and, without strong evidence to the contrary, we will take him at his word when he informs us that he has conducted a *de novo* review and considered the plaintiffs objections in compliance with § 636(b)(1). *See United States v. Severson*, 49 F.3d 268, 273 (7th Cir. 1995); *United States v. Rodriguez*, 888 F.2d 519, 521-22 (7th Cir. 1989); *see also Stokes v. Singletary*, 952 F.2d 1567, 1576 (11th Cir. 1992); *United States v. Remsing*, 874 F.2d 614, 618 (9th Cir. 1989); *cf. Orpiano v. Johnson*, 687 F.2d 44, 47-48 (4th Cir. 1982) (holding that "[f]ailure to review the evidence presented to the magistrate and failure even to have a transcript filed with the district court . . . was reversible error"); *United States v. Tortora*, 30 F.3d 334, 337 (2d Cir. 1994) (holding that: "By blindly adopting the magistrate judge's findings, apparently without ever having received a report and recommendation, the district court violated § 636(b)(1)."). To do otherwise would be contrary to our very system of law. Accordingly, we refuse to accept Pinkston's invitation to inquire as to whether the district court "rubber stamped" the magistrate's opinion, and hold that a district court's assurance in a written order that the court has complied with the requirements of 28 U.S.C. § 636 is sufficient, in all but the most extraordinary of cases, to resist assault on appeal.

The decision of the district court is

AFFIRMED.

A true Copy:

     Teste:

                  _____

                  *Clerk of the United States Court of*
                  *Appeals for the Seventh Circuit*